IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

M.C., ET AL.                    :

                               :

    v.                         :   Civil Action No. DKC 13-3617

                               :

JOSHUA STARR, ET AL.           :

                               :


**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action arising under the Individuals with Disabilities Education Act ("IEDA"), 20 U.S.C. §§ 1400 *et seq.*, are the motion for summary judgment filed by M.C. and her parents, J.J.C. and J.F.C. (collectively, "Plaintiffs") (ECF No. 12), and a cross motion for summary judgment filed by Montgomery County Board of Education and its Superintendent Joshua Starr (collectively, "Defendants" or Montgomery County Public Schools "MCPS") (ECF No. 15). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion for summary judgment will be denied, and Defendants' cross motion for summary judgment will be granted.

## I.   The Individuals with Disabilities Education Act

In order to understand the procedural posture of this case, a short summary of the IDEA is in order. The IDEA, 20 U.S.C. §§

1400 *et seq.*, and accompanying regulations, 34 C.F.R. § 300 *et seq.*, require all states that receive federal funds for education to provide each child between the ages of three and twenty-one who has a disability, with a free, appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A).  Maryland also has regulations governing the provision of FAPEs to children with disabilities in accordance with the IDEA.  Md. Code Regs. Tit. 13A, § 05.01.

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process.  *See Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 192 (1982).  The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child.  *Id.* at 207.  The benefit must also be provided in the least restrictive environment ("LRE") appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers.  20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550.  The IDEA does not require that a school district provide a disabled child with the best possible education, *Rowley,* 458 U.S. at 192, or that the education maximize each child's potential, *see Hartmann v. Loudoun Cnty. Bd. of Educ.,* 118 F.3d 996, 1001 (4th Cir. 1997).  The benefit conferred, however, must amount to more than trivial progress.  *See Reusch*

*v. Fountain,* 872 F.Supp. 1421, 1425 (D.Md. 1994) (*Rowley's* "some educational benefit prong will not be met by the provision of de minimis, trivial learning opportunities.") (*citing Hall v. Vance Cnty. Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir. 1985)).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be learning disabled.  20 U.S.C. § 1414(d).  The student's IEP is formulated by a team ("IEP team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results and evaluations of the child, and, when appropriate, the child himself.  20 U.S.C. § 1414(d)(1)(B); Md. Code Regs. Tit. 13A, § 05.01.07(A).  The IEP must state the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," *i.e.,* spend time in regular school classroom with non-disabled students.  20 U.S.C. § 1414(d)(1)(A).

The IDEA provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions."

*MM ex rel. DM v. Sch. Dist. of Greenville Cnty.,* 303 F.3d 523, 527 (4th Cir. 2002) (internal citations and quotation marks omitted); *see also* 20 U.S.C. § 1415.  Among those safeguards, a parent must be provided prior written notice of a decision to propose or change the educational placement of a student.  Md. Code Regs. Tit. 13A, § 05.01.13(B).  A parent may also request a meeting at any time to review and, as appropriate, revise the student's IEP.  Md. Code Regs. Tit. 13A, § 05.01.08(B)(3).

If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child."  20 U.S.C. § 1415(b)(6).  After such a complaint has been received, the parents are entitled to request a due process hearing conducted by the state or local educational agency.  20 U.S.C. § 1415(f). In Maryland, the Maryland Office of Administrative Hearings conducts the due process hearing.  Md. Code Ann., Educ. § 8-413; Md. Code Regs. Tit. 13A, § 05.01.15(C)(1).  Any party can then appeal the administrative ruling in federal or state court.  Md. Code Ann., Educ. § 8-413(h).

When a FAPE is not provided to a disabled student, the student's parent may place the child in a private school and then seek tuition reimbursement from the state.  *See Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 369-70 (1985).

4

To establish entitlement to reimbursement for unilateral private placement,[1] certain conditions must be met.   Title 20 § 1412(a)(1)(C)(iii), states that:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a *timely* manner *prior* to that enrollment.

*Id.* (emphasis added).   Under 20 U.S.C. § 1412(a)(10)(C)(iii), reimbursement may be reduced or denied if the parents fail to give the public school district notice that they are rejecting the district's proposed FAPE placement, removing their child from public school, or if the parents take some other unreasonable action.   Finally, in order to receive reimbursement, the private education services obtained by the parents must be appropriate to meet the child's needs.   *Sch. Comm. of Burlington,* 471 U.S. at 370.

---

[1] A unilateral private placement occurs when parents enroll their child in a private school without the consent or a referral from the public school district.

## II.  Background

### A.  Factual Background[2]

M.C. is a fifteen-year old girl, who grew up in Maryland with her parents, J.J.C. and J.F.C.  As early as pre-school, she began having trouble with paying attention, tics, and behavioral meltdowns.  M.C.'s tics included blinking her eyes, shrugging her shoulders and hopping.  In 2005, when M.C. was in first grade, her parents first took her to see a psychologist due to her attention problems, and she was diagnosed with attention deficit hyperactivity disorder ("ADHD").  Her parents withdrew M.C. from public school after second grade and enrolled her in McLean School of Maryland.

Throughout elementary school her symptoms intensified.  In 2009, as M.C. started fifth grade, she developed separation anxiety and her behaviors worsened.  In October 2009, she was admitted to Johns Hopkins Hospital for several weeks due to her increasing symptoms.  She was diagnosed with ADHD, anxiety disorder, mood disorder, auditory processing disorder, poor coping skills, and Tourette Syndrome.  When M.C. was discharged in November 2009, she was referred to a day treatment program at Dominion Hospital in Falls Church, Virginia, which she attended

---

[2] Unless otherwise noted, the facts are undisputed.

6

throughout the remainder of the year.  While at Dominion, M.C. was treated for mood stability and potential for self-harm.

In the fall of 2010, M.C. started sixth grade and her condition deteriorated.  She could not function in school and was having frequent meltdowns, so her parents withdrew her in November 2010 for medical reasons and she started receiving Home and Hospital Teaching until February 2011.  She was then enrolled in a small private school for the remainder of the 2010-2011 school year, but she did not often attend and instead received tutoring at home.  For seventh grade, the 2011-2012 school year, M.C.'s parents homeschooled her using a computer based school program and a home school teacher.

In early 2011, M.C. was diagnosed as having Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcus infection ("PANDAS").  PANDAS is a "subset of childhood obsessive-compulsive disorders [("OCD")] and tic disorders believed to be caused by the streptococcus infection." (ALJ Decision, at 13).  M.C.'s symptoms worsened in spring and summer 2012, and M.C. was admitted to Rogers Memorial Hospital ("Rogers") in Oconomowoc, Wisconsin for treatment to reduce her tics, manage her medicine, and improve her mood lability.  M.C. was a patient at Rogers from August 8, 2012 until November 27, 2012.  While at Rogers, M.C.'s treating psychiatrist, Dr. Stephanie Eken, ordered a psychological evaluation of M.C.,  and

psychologist Dr. Denise Reese diagnosed her as having: "ADHD, generalized anxiety disorder, Tourette disorder, OCD, separation anxiety (by history), PANDAs, and severe problems in the academic and social environments." (*Id.* at 14). Dr. Reese made several therapeutic recommendations, including that M.C. receive an IEP, because her severe OCD and PANDAS made it hard for her to function in a regular school setting. Dr. Reese believed that M.C. would do best in a "therapeutically oriented school where she receives constant individual attention from someone trained in both therapeutics and educational strategies[,]" but she did not specifically recommend that M.C. attend a residential school. (*Id.* at 15). Upon discharge, Dr. Eken recommended that she attend a therapeutic boarding school, such as the Glenholme School.

Immediately upon M.C.'s discharge from Rogers on November 27, 2012, M.C. and her parents flew to Connecticut to interview for admission at Devereux Glenholme School ("Glenholme"). M.C. was accepted and began attendance on November 30, 2012. After M.C.'s admission, she was evaluated by Glenholme's psychiatrist, Dr. Frank Ninivaggi, who diagnosed her as having an "anxiety disorder, Tourette[] Syndrome, OCD, ADHD (by history), PANDAS, and psychosocial stressors of chronically impaired social skills and poor academic performance." (*Id.* at 15).

## B.    The IEP Process

On November 1, 2012, while M.C. was a patient at Rogers, her parents requested that MCPS evaluate M.C. for special education services.   On December 11, 2012, MCPS held an IEP meeting to review M.C.'s application for special education services.   At this meeting, M.C.'s mother reported that M.C. was in the process of being discharged from Rogers and that she was going immediately to Glenholme, a residential school.   The IEP team ordered educational and psychological evaluations of M.C. An evaluation was performed from January 17-18, 2013 by Suzanne Shacoski, a school psychologist with MCPS, who traveled to Glenholme to interview, evaluate, and review M.C.'s educational file.   She also reviewed previous reports, and evaluations from M.C.'s various psychologists, psychiatrists, and medical doctors.   Ms. Shacoski determined that M.C. met the criteria for a disability pursuant to the IDEA as Other Health Impaired ("OHI"), meaning she has limited strength, or alertness due to chronic or acute health problems.[3]   She also suggested that the IEP team consider whether M.C. has an emotional disability.   She

---

[3]    Ms. Shacoski noted specifically that M.C. "shows significantly limited alertness due to chronic health problems of ADHD, Tourette Syndrome, Anxiety and OCD that overlay each other in limiting her attention and ability to sustain on tasks, learning and social experiences and adversely affects her educational performance and peer and adult relationships." (MCX-45-16).

made no recommendation regarding a day school program versus a residential program, but she made several recommendations regarding M.C.'s education and treatment.

On February 6, 2013, MCPS held a second IEP team meeting to review Ms. Shacoski's report.  The IEP team determined that M.C. was eligible for special education services as a student with OHI, but that she did not meet the criteria for an emotional disability ("ED").[4]  On February 25, 2013 and May 7, 2013, the IEP team reconvened.  At the February 25 meeting, the team discussed M.C.'s IEP goals and objectives, and determined that she would require thirty hours of special education per week, *i.e.,* zero hours in the general education program.  (MCX-53-29).[5] Because M.C. was in need of a full-time special education setting, the IEP team referred her to MCPS's Central IEP team ("CIEP team").  (ECF No. 12-1, at 13).  Meanwhile, the parties continued to obtain additional reports and evaluations of M.C.

---

[4] Although Ms. Shacoski found that M.C. exhibited four out of five criteria for an ED under the IDEA, the IEP team found that she did not have an ED because "she did not exhibit behaviors directly related to the emotional condition documented and because the emotional condition was not primarily the result of physical, sensory, or intellectual disability."  (ALJ Decision, at 18).

[5] The designation "T." refers to testimony from the Due Process hearing; "MCX-(exhibit number)-(page number)" refers to exhibits offered by Plaintiffs at the Due Process hearing; "BDX" refers to exhibits offered by Defendants at the Due Process hearing; and "ALJ Decision" refers to the ALJ's November 6, 2013 Decision.

On May 7, 2013, the CIEP team met and concluded that M.C. required small structured classes throughout the day and on-site mental health support, among other services. The team considered numerous placements for M.C., including: general education classes at Frost Middle School ("Frost"); ED Cluster services at Richard Montgomery High School; Bridge Services at Winston Churchill High School; public day school; residential schools; and the John L. Gildner Regional Institute for Children and Adolescents ("RICA"). The team found that M.C.'s needs could be met in a therapeutic day school, despite the concerns of M.C.'s parents' and insistence that M.C. remain at Glenholme.[6] It concluded that RICA was the appropriate placement for her because it could deliver the MCPS curriculum and mental health support she required. Although M.C.'s parents disagreed with

---

[6] The IEP team rejected Glenholme, stating that:

> MCPS staff feels that [M.C.'s] special education and related services needs can be met in a separate day school with therapeutic support. Therefore, she does not require a residential school for educational purposes. The team felt that the RICA program could deliver the MCPS curriculum, mental health support and the opportunity for [M.C.] to mainstream back into a general education setting as she makes progress. (MCPS #30).

(ALJ Decision, at 18).

this placement, they agreed to cooperate with the referral process.

On May 14, 2013, George Moore, the Coordinator of MCPS's Placement and Assessments Unit, wrote to M.C.'s parents, indicating that RICA must be investigated as a fit for M.C. He stated that a pre-admissions interview was scheduled for M.C., and that the interview could be conducted by telephone. He indicated that M.C. could be placed in the residential program based on clinical recommendations from the Maryland Department of Health and Mental Hygiene ("DHMH"), but that initially the IEP team had recommended the day program at RICA. M.C.'s parents and her psychotherapist, Dr. Kimberly Ernst, then visited RICA. They thought RICA was an inappropriate placement for M.C. and rejected it.[7]

On June 11, 2013, M.C.'s parents received a letter from MCPS asking to reconvene an IEP meeting to discuss other

---

[7] The parties contest whether M.C.'s parents rejected the placements or whether the schools rejected M.C. M.C.'s parents note that when they attended the interview at RICA, they explained to RICA's clinical social worker, Joan Gottesman, that changing M.C.'s placement to RICA would "create a lot of difficulties for her" and they believed that after sharing these concerns "an interview was a 'dead issue[.]'" (*Id.* at 14). M.C.'s parents state that they left believing that "everyone agreed that RICA was not an appropriate placement for M.C.[,]" and they received no further requests for an interview. They wrote a follow up letter to Mr. Moore on June 3, 2013, sharing their view that RICA was an inappropriate placement. In response to their letter, they received a letter written on June 7, 2013 from RICA rejecting M.C. (*Id.*).

suitable placement options for M.C.; in response, her parents authorized referrals for M.C. to other placements without the need for an additional IEP meeting. Thereafter, on June 26, 2013, MCPS notified Frost that it was considering placing M.C. there. M.C.'s parents and Dr. Ernst then visited Frost and rejected it.[8] M.C.'s parents received a copy of her rejection from Frost on July 18, 2013. (ECF No. 12-1, at 15). On July 25, 2013, Mr. Moore followed up with RICA to get additional information on why M.C. was rejected. The Director of Clinical Services at RICA responded on July 29, 2013 that "the decision to reject her from our program was based on (1) verbal reports from her parents and therapist about her current presentation of emotional fragility, difficulty transitioning and unpredictable triggers, and (2) [o]ur preadmission interviewer Joan Gottesman, LCSW-C was recommended against having a telephone interview with M.C., by the parents and therapist, given her fragility and minimal progress." (*Id.* at 15-16) (*citing* MCX-82-1).

---

[8] M.C.'s parents note that during their visit to Frost, they met with its Director, Claire Cohen, who: "did not explore interviewing M.C. and never suggested that Frost was inappropriate because M.C. was not available to interview." (ECF No. 12-1, at 15). Instead, they state that Ms. Cohen told them she was going to write a letter to MCPS "indicating that Frost was inappropriate for M.C., but that the parents would reconsider the school in the future if it became appropriate for her." (*Id.*). They indicate that contrary to what she had told them in person, Ms. Cohen wrote a letter to MCPS stating that "because she was unable to interview M.C., Frost was not able to offer her a placement." (*Id.*).

On July 30, 2013, MCPS's counsel sent a letter to Plaintiffs, indicating that an interview with M.C. would be necessary.  He stated that Frost and RICA had rejected M.C. because M.C.'s parents had declined to make her available for an interview.  (ECF No. 12-1, at 16).  M.C.'s parents responded on August 12, 2013, emphasizing that MCPS counsel had mischaracterized the events and reiterated that "all experts involved strongly recommended against the interview process." (*Id.*).

### C.   Procedural Background

On June 21, 2013, Plaintiffs filed a due process complaint with the Maryland Office of Administrative Hearings (the "OAH"), requesting a hearing to review the services and placement offered to M.C. by MCPS for the 2012-2013 and the 2013-2014 school years.  M.C.'s parents alleged that MCPS failed to "propose an appropriate educational program or placement for M.C. and [sought] reimbursement for her placement at Glenholme." (ECF No. 12-1, at 16).  The parties waived the prehearing resolution meeting.  The Administrative Law Judge D. Harrison Pratt ("ALJ"), held a hearing on the following days:  September 30, October 1-3, and October 7, 2013.  The ALJ framed the issues presented as follows:

> (1) Did MCPS offer [M.C.] a free
> appropriate public education in the least

> restrictive environment for the 2012–2013
> and 2013–2014 school years?
>
> (2) If not, was [M.C.'s] unilateral
> placement at the Glenholme School
> (Glenholme) for the 2012–2013 and the 2013–
> 2014 school years appropriate?

(ALJ Decision, at 2).  On November 6, 2013, the ALJ issued his

opinion.  He concluded that M.C.'s parents, who had the burden

of proof, failed to show:

> 1.   That delay by [MCPS] denied [M.C.] a
>      FAPE.
>
> 2.   That MCPS failed to work with the
>      Parents in identifying a proper
>      placement.
>
> 3.   That MCPS was obligated to identify
>      other placements after the Parents
>      rejected RICA and Frost.
>
> 4.   That [M.C.] requires a residential
>      placement in order to make meaningful
>      educational progress.
>
> 5.   That the MCPS has failed to offer
>      [M.C.] an education program, including
>      [a] placement that is reasonably
>      calculated to provide her with a FAPE.

(ALJ Decision, at 58–59).  The ALJ denied Plaintiffs' request

for reimbursement for M.C.'s unilateral private placement at

Glenholme, after finding as a matter of law that MCPS's

placement of M.C. at "RICA was reasonably calculated to provide

her with a FAPE for the 2012–2013 and 2013–2014 school years[,]"

and that "RICA is less restrictive than placement at the

Glenholme School." (*Id.* at 59).

15

On December 6, 2013, Plaintiffs filed a complaint in this
court, appealing the ALJ's November 6, 2013 decision. (ECF No.
1). Defendants answered on January 7, 2014. (ECF No. 6). On
April 4, 2014, Plaintiffs filed a motion for summary judgment.
(ECF No. 12). On June 11, 2014, Defendants filed an opposition
and a cross motion for summary judgment. (ECF No. 15). Both
motions have been fully briefed.

## III. Cross Motions for Summary Judgment

### A.    Standard of Review

In *MM ex rel. DM,* 303 F.3d at 530-31, the United States
Court of Appeals for the Fourth Circuit articulated the standard
of review for motions for summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a
> reviewing court is obliged to conduct a
> modified *de novo* review, giving "due weight"
> to the underlying administrative
> proceedings. *Board of Educ. v. Rowley,* 458
> U.S. 176 [] (1982); *Doyle v. Arlington
> County Sch. Bd.,* 953 F.2d 100, 103 (4th Cir.
> 1991) ("Generally, in reviewing state
> administrative decisions in IDEA cases,
> courts are required to make an independent
> decision based on a preponderance of the
> evidence, while giving due weight to state
> administrative proceedings."). In such a
> situation, findings of fact made in
> administrative proceedings are considered to
> be *prima facie* correct, and if a reviewing
> court fails to adhere to them, it is obliged
> to explain why. *Doyle,* 953 F.2d at 105.
> The court is not, however, to "substitute
> [its] own notions of sound educational
> policy for those of local school
> authorities." *Hartmann v. Loudoun County*

> *Bd. of Educ.,* 118 F.3d 996, 999 (4th Cir. 1997).

This standard works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases, as illustrated in *Bd. of Educ. of Frederick Cnty. v. I.S. ex rel. Summer,* 325 F.Supp.2d 565, 578 (D.Md. 2004):

> [T]he Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 101 (4th Cir. 1987) (*quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 324, [] (1986); Fed.R.Civ.P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, [] (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, [] (1986). Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care . . . to draw all reasonable inferences against the party whose motion is under consideration."

*Mingus Constructors, Inc. v. United States,*
812 F.2d 1387, 1391 (Fed.Cir. 1987).

Plaintiffs face an uphill battle in this case, because just as they were required to carry the burden of proof in the administrative hearing, so too must they carry the burden of proof here. *See Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49 (2005); *Cavanagh v. Grasmick,* 75 F.Supp.2d 446, 457 (D.Md. 1999). Moreover, "[i]f the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanagh,* 75 F.Supp.2d at 457 (*citing Doyle,* 953 F.2d at 103).

Plaintiffs make a blanket argument at the outset of their brief that the ALJ's findings were not regularly made and thus, are not entitled to deference. (ECF No. 12-1, at 20-21). According to Plaintiffs, the ALJ repeatedly ignored the evidence or testimony presented by Plaintiffs, and blindly deferred to the evidence and testimony from Defendants. As discussed below, the ALJ's opinion demonstrates that he reviewed all the evidence presented at the due process hearing, but found some evidence and testimony more credible than other evidence. Therefore, the ALJ's factual findings appear to have been regularly made on each issue raised by the parties and thus, will be given due deference.

18

B.    Analysis

1.  Procedural Challenges

a.    MCPS Proposed a FAPE for M.C.

Plaintiffs first argue that MCPS's referral of M.C. to RICA did not fulfill its statutory mandate to provide her a FAPE, because RICA was not ready and willing to accept M.C. as a student.   According to Plaintiffs, "[a] school system cannot merely make referrals to satisfy its statutory responsibility to provide a placement[;] . . . [r]ather, a school system must make an actual offer of services at a particular location that can meet the individual needs of the child."  (ECF No. 12-1, at 22). Plaintiffs allege that MCPS made referrals to two schools — RICA and Frost — but because both schools rejected M.C., MCPS never fulfilled its statutory responsibility to provide her a FAPE.

In response, Defendants assert that MCPS offered M.C. placements at both RICA and Frost.   Defendants argue that the ALJ correctly rejected the parents' argument on this issue, finding that M.C.'s parents "intentionally embarked on a concerted plan designed to frustrate the process that would have led to M.C.'s acceptance to either proposed placement by refusing to make her available for an interview."  (ECF No. 15-1, at 16).  Defendants argue that Plaintiffs' reliance on the Fourth Circuit's decision in *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672 (4th Cir. 2007), is misplaced, because in that case

the school system never specifically identified a placement for the student, whereas here, MCPS identified two appropriate placements for M.C. "neither of which could be consummated due to the Parents' refusal to make M.C. available for an interview[.]" (ECF No. 15-1, at 18).

The ALJ rejected the parents' argument that MCPS never offered M.C. a placement and the record supports his finding. (ALJ Decision, at 23-24). The IEP team, which included M.C.'s parents, met on February 25, 2013 and May 7, 2013 to work on M.C.'s initial IEP. The IEP meeting documentation shows that the team considered several placements for M.C., including Glenholme, but ultimately decided that M.C.'s needs could best be met through a "separate day school with therapeutic supports." (BDX-30-37). M.C.'s parents were made aware at the May 7, 2013 meeting that the team had proposed RICA as her placement. In addition, M.C.'s parents received written verification of the proposed placement at RICA in Mr. Moore's May 14, 2013 letter to them. Although M.C.'s parents did not agree with the IEP team's assessment that RICA and Frost were appropriate placements for M.C., MCPS certainly fulfilled its procedural duty to propose specific placements for M.C.

Contrary to M.C.'s parents' assertions, this case is unlike *A.K.,* 484 F.3d at 681, because M.C.'s IEP identified a particular school placement, RICA, and M.C.'s parents were not

"left to fend for themselves" to find a placement for her. Indeed, M.C.'s situation is more similar to the student in *Bobby v. Sch. Bd. of City of Norfolk,* No. 2:13CV714, 2014 WL 3101927, at *4, 13-14 (E.D.Va. July 7, 2014), whose parents refused to permit a second observation of their child which prevented the school district from being able to determine a specific classroom assignment for her.  The court in *Bobby* addressed the district's alleged failure to identify a specific classroom, noting that "if [this procedural defect] exists at all — [it] arose exclusively from the parents' refusal to permit a second observation or otherwise cooperate in the development of [the student's] IEP.  They have produced no evidence that a classroom in the [district] could not meet their daughter's needs — only evidence that they preferred her needs be met elsewhere." *Id.* at *13-14.  Similarly, MCPS proposed specific placements for M.C. — RICA then Frost — that the team believed would meet her needs, but no specific school was ever selected due to M.C.'s parents' refusal to make her available for an interview.  Thus, these schools were never able to verify that they could implement her IEP.  If there was any procedural defect, it was not due to any shortfalls by MCPS, but to M.C.'s parents' failure to cooperate with the placement process.

**b.    M.C.'s Parents Frustrated the IEP Placement Process
and Did Not Act in Good Faith**

Plaintiffs next argue that the ALJ erred in finding that
M.C.'s parents frustrated the IEP placement process by refusing
to allow M.C. to be interviewed and that the parents acted in
bad faith throughout the IEP process.

**i.    M.C. was Capable of Interviewing and Her Parents
Frustrated MCPS's Placement Process by Refusing to
Allow her to Interview**

First, Plaintiffs assert that the ALJ incorrectly concluded
that they refused to allow M.C. to be interviewed.   M.C.'s
parents insist that they expressed their concerns about M.C.'s
ability to handle an interview, but did not outright refuse an
interview.  (ECF No. 12-1, at 27).   In addition, Plaintiffs
argue that neither MCPS nor the proposed placement schools
informed them that an interview was a prerequisite to admission,
or questioned their assertions about M.C.'s ability to
participate in an interview until the end of July 2013, after
the parents had already filed a due process complaint. (ECF No.
18, at 8).

Defendants argue that even though Plaintiffs have offered a
differing interpretation of the evidence regarding the interview
and placement process, they have provided no reason to reject
the ALJ's finding that M.C. was capable of being interviewed and
that her parents' actions and letters amounted to a refusal to

allow M.C. to interview.  (ECF No. 15-1, at 20-21).  Defendants
contend that the ALJ correctly rejected the parents' argument
that they did not believe an interview was necessary for M.C. to
receive a placement or that MCPS had waived the requirement.
The parents' attorney, Michael Eig, acknowledged that both
parties knew that an interview was part of the IEP placement
process and Mr. Eig never obtained a written waiver from MCPS
releasing M.C. from the interview requirement.  Defendants add
that if the parents were truly acting in good faith to obtain a
FAPE for M.C. for the 2013-2014 school year, then after
receiving MCPS's July 30, 2013 letter which indicated that an
interview was required, they could have made M.C. available at
that point for an interview, but there is no evidence that they
made any attempt to do so.  (ECF No. 15-1, at 25-26).

     The ALJ's factual findings regarding M.C.'s ability to
interview and her parents' refusal to permit her to interview
are supported by the evidence.  The ALJ found that "[a]lthough
the Parents may not have specifically said that they would not
allow [M.C] to be interviewed, their actions, coupled with
correspondence from their attorney and Dr. Ernst certainly
amounted to a refusal." (ALJ Decision, at 28).  He also noted
that "I believe that the Parents were acting in bad faith with
regard to [M.C.'s] interview and this stymied efforts by the
MCPS [to finalize a school placement for M.C.]." (*Id.* at 27).

Plaintiffs have not pointed to evidence in the record which demonstrates their willingness to allow M.C. to be interviewed. In fact, all communications from M.C.'s parents, their attorney, and their experts that were sent to MCPS, RICA, and Frost staff, indicate that they had significant concerns about M.C.'s capacity to handle an interview, even a telephonic interview. Moreover, the timing of these communications, which were usually sent in response to a request from MCPS for an interview or after M.C. failed to attend a school interview with her parents, and the phrasing of these communications, make clear that M.C.'s parents did not consent to her being interviewed. (*See* ALJ Decision, at 28-29). Accordingly, the parents' communications and conduct amounted to a refusal to allow her to interview.

Plaintiffs also argue that RICA and Frost did not initially inform them that each was rejecting M.C. due to the lack of an interview, and that they were not officially informed of this until late July 2013. (ECF No. 12-1, at 25). Plaintiffs contend that RICA and MCPS personnel never questioned their assertions that M.C. was too fragile to interview, thus, they were led to believe that the interview was a "dead issue." They imply that had they known that an interview was *required* by MCPS to get a FAPE placement, they would have made M.C. available for interviews.

Plaintiffs' arguments are unsupported by the record.  The ALJ acknowledged in his decision that "MCPS was not as clear as it might have been concerning [M.C.'s] interview[,]" but he ultimately decided that M.C.'s parents were aware that an interview was part of the IEP placement process and was not voluntary.  (ALJ Decision, at 27-29).  Upon a review of the record, the court agrees.  M.C.'s mother admitted at the due process hearing that she received a letter from RICA regarding the interview process, advising both parents and M.C. to attend the RICA interview.  (T. 399-400).  Moreover, Mr. Moore's May 14, 2013 letter to M.C.'s parents expressly states:  "[a]s you are aware, a pre-admissions clinical interview is scheduled for [M.C.] at JLG-RICA on Thursday, May 23, 2013.  It is my understanding that the JLG-RICA staff will interview [M.C.] by telephone."  (MCX-60).  Furthermore, if the parents were still uncertain of MCPS's policy on student interviews, it was definitively clarified in MCPS's July 30, 2013 letter to Plaintiffs' attorney, Michael Eig, which stated:

> Because your clients have maintained that under no circumstances would they make [M.C.] available for an interview in connection with the admissions process at either [RICA or Frost], they have both declined to offer [M.C.] a placement. . . .
>
> MCPS is prepared to consider any reasonable limitations to the scope and process of the interviews to be conducted by RICA and Frost staff.  However, until presented with data

> to the contrary, [MCPS] rejects the position
> that [M.C.'s] condition has degenerated to
> such a degree during the ensuing six months
> she has spent at Glenholme since her
> interview with Ms. Shacoski as to render her
> unconditionally incapable of participating
> in the interview process with RICA and
> Frost. . . .
>
> I await your prompt response.

(MCX-83).  Based on these facts alone, it is apparent that M.C.'s parents were aware at the time of their visits to RICA and Frost that M.C. was expected to interview at these proposed placements, but they refused to give permission for her to do so.  M.C.'s parents' assertion that they would have given permission if they knew the interview was required is undermined by the fact that when they received a letter from MCPS on July 30, 2013 expressly stating that an interview was required, they failed to respond or make M.C. available at that time.  MCPS did not need to continue suggesting new placements or reaching out to Plaintiffs for interviews with M.C. when they had already requested, on several occasions, that M.C. interview and her parents had rebuffed those requests.  Because the parents refused to allow M.C. to interview throughout the placement process, once they received the letter from MCPS indicating M.C. must be available for an interview if she wanted a placement, the onus was on M.C.'s parents to respond and cooperate with the interview process.

26

The ALJ further found that "[M.C.] was capable of being interviewed at both RICA and Frost, but also that such an interview could have been conducted with minimal if any negative impact." (ALJ Decision, at 33). Plaintiffs challenge this finding, stating that the ALJ ignored the testimony of Dr. Ernst, M.C.'s psychotherapist, and Ms. Satalino, a social worker at Glenholme, indicating that an interview would have been disruptive to M.C. and caused her angst and concern. (ECF No. 12-1, at 29). The ALJ credited the testimony of Ms. Schultze, principal at RICA, over that of Plaintiffs' witnesses on this issue, and his credibility determination is due deference.

As noted in *S.A. v. Weast,* 898 F.Supp.2d 869, 874 (D.Md. 2012), in reviewing IDEA cases, the district court "owes deference to the ALJ's determinations of the credibility of witnesses[,] and . . . owes generous deference to educators." Additionally, ALJ's credibility determinations which are "regularly made" are due deference. *See J.P. v. Cnty. Sch. Bd. of Hanover Cnty., Va.,* 516 F.3d 254, 259-60 (4th Cir. 2008)) ("When determining whether a hearing officer's findings were regularly made, our cases have typically focused on the *process* through which the findings were made: Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." (internal quotation and citation marks omitted)); *see also Doyle,* 953 F.2d

at 104 ("[W]e have held that '[w]e may not reverse a trier of
fact, who had the advantage of hearing the testimony, on the
question of credibility'" (quoting McCrary v. Runyon, 515 F.2d
1082, 1086 (4th Cir. 1975)).   Furthermore, when making a
determination about witness credibility, the "IDEA hearing
officer is not required to offer a detailed explanation of his
or her credibility assessments." Id. at 877 (citing J.P., 516
F.3d at 259).

Here, the ALJ did not ignore the testimony of Plaintiffs'
witnesses on M.C.'s capability to interview, he simply
determined that Ms. Schultze's testimony was more credible, a
determination that is due deference.   Moreover, the ALJ's
finding is adequately supported by other evidence in the record.
For example, M.C. had been interviewed and clinically evaluated
on numerous occasions leading up to MCPS's interview requests in
the summer of 2013.   M.C. had just interviewed at Glenholme and
been evaluated by Dr. Ninivaggi in November and December of
2012, and was clinically evaluated by Ms. Shacoski in January
2013.   M.C.'s mother also testified at the due process hearing
that she thought M.C. was capable of getting through an
interview at RICA, but that it "would have increased her anxiety
and stress level thereafter[.]"   (T. 400-01).   The ALJ noted
that the reports of those interviewing and evaluating M.C. did
not mention that her participation in these interviews had any

significant impact on her, and her mother even testified at the hearing that M.C. suffered no ill effects due to the interviews. (ALJ Decision, at 34).  Furthermore, MCPS offered accommodations to M.C. in order to make the interview process as comfortable as possible, which further supports that it was possible for M.C. to participate in some type of interview without causing it unduly to impact her emotional state or cause her to regress. (ALJ Decision, at 31; MCX-83; MCX-60).  Accordingly, the ALJ's findings that M.C. was capable of being interviewed and that M.C.'s parents frustrated the IEP placement process by refusing to allow an interview are supported by the record.

### ii. M.C.'s Parents Acted in Bad Faith During the IEP Process by Refusing Genuinely to Consider Any Placement Except Glenholme

Plaintiffs contend that the ALJ erred because the record reveals that they participated in the IEP process and cooperated with MCPS in good faith by attending meetings and school visits and assisting MCPS in gathering information about M.C. (ECF No. 12-1, at 30).  Plaintiffs also argue that enrolling M.C. in a private school while the IEP process was underway is not evidence of bad faith.  Plaintiffs allegedly were required to enroll M.C. in a residential program in order for her to be

released from Rogers, and thus, could not wait for MCPS to offer
M.C. a FAPE before moving her to Glenholme.[9]  (ECF No. 18, at 4).

Defendants respond that the ALJ correctly found that M.C.'s
parents acted in bad faith throughout the IEP process by having
a preconceived belief that a residential school was the only
appropriate placement for M.C. and that Glenholme was the only
such school that would meet M.C.'s needs.  (ECF No. 15-1, at 25-
27).  Defendants argue that M.C.'s parents did not act in good
faith because they enrolled her in a private school before the
IEP process even began and then failed truly to consider any
public school placement offerings made by MCPS.  In addition,
Defendants argue that the parents' argument that they were fully
cooperative during the IEP process is belied by the ALJ's
finding that they frustrated the IEP process by refusing to make
M.C. available for interviews, as discussed above.

The ALJ found that M.C.'s parents did not genuinely
consider the placements offered by MCPS:

> I believe the decision to reject RICA and
> Frost was preconceived.  For one thing, the
> Parents were obligated to pay the costs and
> fees at Glenholme regardless of whether
> [M.C.] attended any MCPS school or any other
> school [because they had already enrolled

---

[9]  In support of this argument, Plaintiffs cite *Kitchelt v.
Weast,* 341 F.Supp.2d 553, 557 n.1 (D.Md. 2004), for the
proposition that just because parents believe that the best
education the public school system can provide is not a FAPE, it
does not mean they have acted in bad faith as long as they
engage in the IEP process in good faith.

her for the year].  .  .  .  At the time of
enrollment at Glenholme, the Parents were
already considering the possibility of MCPS
paying for the Glenholme placement.  The
parents clearly believed that *only* a
residential therapeutic school was
appropriate for [M.C.], and that Glenholme
was the *only* such school that would do, so
much so that they committed themselves to
costs and fees exceeding $119,000.00 a year.
Although I disagree with the Parents
concerning the need for a residential
therapeutic school, I certainly do not
impugn their beliefs as to the benefit of
such a placement.  I do impugn the sincerity
of their consideration of placement at RICA
or Frost or any other school other than
Glenholme.

(ALJ Decision, at 36-37) (emphasis in original).

The ALJ's decision is supported by the record.  As noted by

the ALJ, the parents' conduct during the IEP placement process

can be distinguished from the parents in *Kitchelt,* because even

though the parents in *Kitchelt* had a private placement in mind

from the start of the IEP process, they considered public school

placements in good faith and did not enroll the student in the

private placement until the district failed to make an IEP

placement by the start of the school year.  By contrast, M.C.

began classes at Glenholme on November 30, 2012, before the

first IEP meeting even took place on December 11, 2012.  At the

very first IEP team meeting, M.C.'s mother stated that Glenholme

"is the only school that could meet [M.C.'s] needs . . . [M.C.]

cannot be accommodated within the MCPS system."  (BDX-12-2).

When the CIEP team made a formal referral for M.C. to RICA at the May 7, 2013 meeting, M.C.'s parents noted their disagreement with the referral before they had even visited to see what RICA had to offer.  (BDX-30-37).  When M.C.'s parents visited RICA, they failed to bring M.C. with them or permit her to interview telephonically so RICA personnel could determine if they could implement her IEP.  They informed RICA personnel, based on their own conclusions, that RICA would not be an appropriate placement for M.C.  Similarly, when M.C.'s parents visited Frost, they failed to bring M.C. with them or make her available to interview.  They also informed the Frost director from the start that Frost was inappropriate for M.C.  Accordingly, the ALJ's decision regarding the parents' bad faith will be affirmed because the parents' conduct demonstrates that they had made up their minds about M.C.'s proposed placements before they even visited, and were determined that Glenholme was the only placement suitable for M.C.

> **c.   MCPS Was Not at Fault for Delaying the IEP Placement Process or Provision of M.C.'s FAPE**

Plaintiffs argue that the ALJ erred by ignoring MCPS's delays in the IEP process.  Plaintiffs contend that the ALJ excused MCPS's delays by erroneously finding that the parents were at fault for repeatedly refusing to produce M.C. for assessments.  (ECF No. 12-1, at 33).  M.C.'s parents state that

they fully cooperated with the assessment process by permitting M.C. to be evaluated at Glenholme.   Plaintiffs argue that the ALJ's finding that significant delays were due to the necessity of obtaining documents about M.C. from Wisconsin and Connecticut, would excuse delays only as to M.C.'s initial eligibility determination for special education services, not for MCPS's delay in creating her IEP and offering her a placement.   According to Plaintiffs, MCPS greatly exceeded the ninety-day timeframe for producing a placement for M.C., a delay which resulted in denying a placement for M.C. for the 2012-2013 and 2013-2014 school years.   (ECF No. 12-1, at 32-33).

Defendants respond that the ALJ correctly found that MCPS did not violate the ninety-day timeframe for providing M.C. a final placement, because an exception to this rule permits MCPS additional time if the parents or student "repeatedly fails or refuses to produce the student for assessments."   (ECF No. 15-1, at 30) (*citing* ALJ Decision at 26) (internal quotation marks omitted).   Defendants argue that the ALJ correctly concluded that any delays were due to the parents' "bad faith pursuit of the IEP process, and M.C. suffered no educational deprivation as a result thereof."   (*Id.*).

First, it should be noted that both parties and the ALJ confused the timeframes that MCPS had for completing the IEP

process.[10]   MCPS had ninety days from receiving a written referral from her parents, and sixty days from the date it received parental consent for an assessment, to perform an initial evaluation of M.C. and determine whether she was eligible for special education and related services.   34 C.F.R. § 300.301(c);  Md.  Code  Regs.  §  13A.05.01.06(A).   MCPS substantially complied with its statutory and regulatory duty to perform an initial assessment of M.C. within ninety days of receiving the written referral from her parents.   MCPS made an eligibility determination for M.C. regarding whether she was eligible for special education and related services on February 6, 2013, which was within sixty days of obtaining M.C.'s parents' permission at the December 11, 2012 IEP meeting to perform assessments of M.C.

---

[10] The ALJ found that any delay by MCPS in issuing a final placement for M.C. was permissible because the delay was the fault of M.C.'s parents by failing to make her available for interviews.   (ALJ Decision, at 26-27) (*citing* COMAR 13A.05.01.06(A)(2)).   The ALJ based this finding, in part, on a regulation that provides school districts a ninety-day timeframe to perform an initial assessment of a student, and an exception to this timeframe if the parents repeatedly refuse to make the student available for this assessment.   The rule and exception cited by the ALJ, however, only appear to apply to the *initial* evaluation and eligibility determination of the student, not the final IEP placement.   Because MCPS performed its initial evaluation and eligibility determination for M.C. within the ninety-day timeframe and M.C.'s parents did not refuse to permit M.C. to be assessed by Ms. Shacoski during this initial step, there was no delay by either party at this stage of the IEP process.

Once the IEP team determined that M.C. was eligible for an IEP based on her initial evaluation, it was required to meet within thirty days to develop an IEP for M.C.  Md. Code Regs § 13A.05.01.08(A) (noting that the "public agency shall ensure that an IEP team meets to develop an IEP for a student with a disability within 30 days of the evaluation").  The Federal Regulation governing the timing of an initial IEP similarly states that, public agencies must ensure that:

> (1)  A meeting to develop an IEP for a child is conducted within 30 days of a determination that the child needs special education and related services; and

> (2)  As soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP.

34 C.F.R. § 300.323(c).  34 C.F.R. § 300.323, titled "When IEPs must be in effect," also provides the general rule that "[a]t the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP[.]"

In this case, M.C.'s parents did not request that M.C. be evaluated until midway through the 2012-2013 school year, specifically on November 1, 2012.  Following the IEP team's decision on February 6, 2013 that M.C. was in fact eligible for special education services, the IEP team convened on February

35

25, well within the thirty-day timeframe.   At this meeting, the IEP team determined that M.C. needed thirty hours of special education services, meaning zero hours in the general education program, and for this reason needed to refer M.C. to MCPS's CIEP team to consider the best placement options.   After additional reports and evaluations were received concerning M.C., the CIEP team met on May 7, 2013 to finish M.C.'s IEP and determine a school placement.   Accordingly, although MCPS did not complete M.C.'s IEP within thirty days of her being found eligible for special education services, the regulations do not expressly require that an initial IEP be fully developed within thirty days, just that the IEP team convene within thirty days, which it did.[11]   The regulations governing initial IEP development also provide that "[a]s *soon as possible* following the development of

---

[11]   Plaintiffs cite several cases for the proposition that procedural violations can be sufficient to deny a child a FAPE. (*See* ECF No. 12-1, at 32) (*citing Tice,* 908 F.2d at 1209); *Gerstmyer v. Howard Cnty. Public Sch.,* 850 F.Supp. 361 (D.Md. 1994)).   The cases cited, however, involve instances where the parents gave the school district plenty of notice (*i.e.,* contacted the school in May regarding an IEP/placement for the following September) that they wanted their child evaluated for the following school year, yet the school districts failed to perform their obligations within the required timeframes resulting in the student not having a FAPE in place at the start of the next school year.   These cases demonstrate the general rule that a FAPE must be in place "[a]t the beginning of each school year[.]"   20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a)-(c).   MCPS fulfilled its obligation to offer M.C. a FAPE placement as soon as possible after her IEP had been developed, or at the latest by the beginning of the 2013-2014 school year.   *Id.*

the IEP, special education and related services are to be made available[.]" 34 C.F.R. § 300.323(c). By providing a proposed placement for M.C. on May 7, 2013, after receiving additional reports to clarify M.C.'s needs, MCPS timely provided a proposed FAPE placement as required during the 2012-2013 school year. In addition, if M.C.'s parents had fully cooperated in good faith during the IEP placement process in the summer of 2013 as discussed above, then MCPS could have timely provided a FAPE for M.C. by the time the 2013-2014 school year began.

Accordingly, Plaintiffs have not met their burden of showing that any of the procedural issues they raised denied M.C. the provision of a FAPE during her 2012-2013 or 2013-2014 school years.[12]

---

[12] Plaintiffs have also argued that the ALJ ignored the fact that MCPS did not provide them the appropriate prior written notice, which is required by the IDEA, of the IEP team's referrals for M.C. to RICA and Frost, nor of her subsequent rejections from those schools. (ECF No. 12-1, at 34). Plaintiffs cite *A.K.*, 484 F.3d 672, for the proposition that a school district has provided insufficient notice of an educational placement if it fails to identify a specific placement.

As noted in *A.K.,* 484 F.3d at 684, "something more than a simple procedural violation [of the IDEA] must exist in order for an aggrieved student to prevail" on a claim that he has not been provided a FAPE. Thus, unless the procedural violation interferes with the provision of the FAPE, for instance, by causing the student to lose an "educational benefit or opportunity[,]" then it is harmless error. *Id.* By Plaintiffs' own admission, they received notice at the May 7 IEP meeting, and in Mr. Moore's May 14, 2013 letter that the IEP team was proposing RICA as M.C.'s placement, and because of this notice

2.     **Substantive Challenges**

In  challenging  whether  M.C.  was  deprived  of  a  FAPE,
Plaintiffs  raise  two  substantive  arguments:  (1)  that  she
required  a  residential  placement  in  order  to  make  educational
progress;  and  (2)  that  RICA  could  not  provide  her  a  FAPE  because
it  required  her  to  make  transitions  during  the  school  day.

In  determining  whether  a  FAPE  has  been  provided,  the  issue
is  not  whether  the  placement  advocated  by  the  parents  is  better,
or  more  appropriate,  but  whether  the  school  has  offered  an
appropriate  placement  capable  of  providing  the  student
educational  benefits.  *A.B.  ex  rel.  D.B.  v.  Lawson,*  354  F.3d
315,  324  (4th  Cir.  2004).  In  *Fairfax  Cnty.  Sch.  Bd.  v.  Knight,*
261  Fed.App'x  606,  607-08  (4th  Cir.  2008),  the  Fourth  Circuit
clarified  that:

> This  Court  has  determined  that  the
> appropriate  education  required  by  the  IDEA
> should  not  be  confused  with  the  best
> possible  education  .  .  .  .  And  once  a  FAPE
> is  offered,  the  school  district  need  not
> offer  additional  educational  services.  That
> is,  while  a  state  must  provide  specialized
> instruction  and  related  services  sufficient

they  attended  a  tour  and  interviewed  at  RICA.  (ECF  No.  12-1,  at
13-14).  Accordingly,  even  if  there  was  a  defect  in  the  notice,
it  was  adequate  to  identify  for  M.C.'s  parents  with  "a
reasonable  degree  of  certainty"  which  placement  MCPS  had
proposed  such  that  it  did  not  interfere  with  the  provision  of
M.C.'s  FAPE.  *See  A.K.,*  484  F.3d  at  684-85  (noting  that  even
though  the  school  district's  notice  was  flawed  "A.K.'s  parents
knew  with  a  reasonable  degree  of  certainty  where  [the  school
district]  proposed  to  educate  their  child"  and  thus,  did  not
deprive  A.K.  of  an  educational  opportunity  or  deny  A.K.  a  FAPE).

> to confer some educational benefit upon the
> handicapped child, the Act does not require
> the furnishing of every special service
> necessary to maximize each handicapped
> child's potential.

*Id.* (*quoting MM ex rel. DM,* 303 F.3d at 526-27) (internal
quotation marks, citations, and alterations omitted).

### a.   M.C. Does Not Require a Residential Placement in Order to Make Educational Progress

Plaintiffs contend that the ALJ erred in finding that M.C.
did not require a residential placement.   Plaintiffs first argue
that the ALJ ignored relevant "testimony, expert reports, and
opinions of those witnesses familiar with M.C. who all agreed
that she needed a residential placement[;]" and instead, blindly
deferred to MCPS's witnesses and their testimony.   (ECF No. 12-
1, at 36).   According to Plaintiffs, it is clear from the record
that "M.C.'s PANDAS affects every aspect of her life, causing
her to be unable to function in numerous environments, including
both public and private, and general and special education
schools for many years."   (ECF No. 12-1, at 45-46).   They assert
that because M.C.'s disability causes her symptoms that impact
her ability to access her education, MCPS is required to provide
her a residential placement.   (*Id.* at 44-46).

Defendants respond that Plaintiffs have provided no support
for their argument that M.C. required a residential setting in
order to benefit from her education.   Defendants point to M.C.'s

prior academic achievement record in non-residential settings (past grades and test scores), stating that "[t]here is no support in the administrative record for the contention that academics were ever an issue for M.C." (ECF No. 15-1, at 31-32 & 32 n.11). Defendants cite a number of cases, including *Shaw v. Weast*, 364 F.App'x 47 (4th Cir. 2010), for the proposition that a state is required to fund a student's residential placement only when residential care is essential in order for the child to make educational progress. Defendants argue that M.C.'s educational needs are not dependent on her receiving the services of a residential program, such as learning to feed and dress herself or utilize the toilet. In addition, Defendants argue that it is evident from the ALJ's opinion that he did not ignore the parents' witnesses, as he devoted a major section to analyzing the testimony from both parties' witnesses; rather, he concluded that MCPS's witnesses were more persuasive.

Plaintiffs' argument that the ALJ ignored their witnesses' testimony and blindly deferred to Defendants' witnesses regarding M.C.'s need for a residential therapeutic school, is unsupported by the record. After reviewing the ALJ's decision, it is clear that he evaluated the testimony of every witness who testified about this issue, as he devoted eighteen pages of his opinion to providing a synopsis of their testimony, specifically

stating their beliefs about whether M.C. needed a residential
setting. (ALJ Decision, at 39-56). He concluded that:

> [A]s to the issue of the need of a
> residential placement, I have given
> significantly more weight to the opinions of
> Ms. Shacoski and Ms. Schultze than those of
> Dr. Reese, Dr. Eken, Mr. Schumacher, and Dr.
> Ernst.
>
> Contrary to counsel's claim that this case
> does not involve a "battle of educational
> experts[,]" in large measure such a contest
> does exist and I am much more persuaded by
> those providing evidence on behalf of the
> MCPS than those providing evidence on behalf
> of the Parents.

(ALJ Decision, at 56).

Plaintiffs' arguments challenging the ALJ's credibility
determinations concerning these witnesses will also be rejected.
Plaintiffs have not presented any evidence that the ALJ's
credibility determinations were anything other than regularly
made — he took testimony from the witnesses; reviewed their
credentials, reports, and other evidence presented; and then
determined based on these factors which testimony was most
persuasive. Thus, the ALJ's decision that MCPS's witnesses were
more credible on the issue of whether M.C. required a
residential placement will be given deference.

After reviewing the record, it is also evident that the
ALJ's decision that M.C. does not require a residential
placement in order to make meaningful educational progress is

supported by the record.   In *Shaw,* 364 F.App'x 47, 53 (4th Cir.
2010), the Fourth Circuit described the circumstances in which
the state is required to fund residential placements:

> "If the educational benefits which can be
> provided through residential care are
> essential for the child to make any
> educational progress at all, then
> residential care is required under the EHA
> [the precursor to the IDEA]." *Burke County
> Bd. of Educ. v. Denton,* 895 F.2d 973, 980
> (4th Cir. 1990) (emphasis in original).
> However, the IDEA "does not authorize
> residential care merely to enhance an
> otherwise sufficient day program." *Id.*
> (*quoting Abrahamson v. Hershman,* 701 F.2d
> 223, 227 (1st Cir. 1983) (emphasis in
> original)).   "If residential placement is
> necessitated by medical, social, or
> emotional problems that are segregable from
> the learning process, then the local
> education agency need not fund the
> residential placement." *Id.* at 980. *See
> also Clovis Unified Sch. Dist. v. California
> Office of Admin. Hearings,* 903 F.2d 635 (9th
> Cir. 1990) (finding student's
> hospitalization was primarily for medical
> and psychiatric reasons and the state was
> therefore not required to fund it).

In *Shaw*, 364 F.App'x at 53, the student was diagnosed with
bipolar disorder, clinical depression, posttraumatic stress
disorder, and had suicidal tendencies.   Her parents placed her
in a residential treatment facility and then sought
reimbursement from the school system.   The court found that "the
treatment of [the student's] mental health and safety issues was
distinct and segregable from her educational needs."   (*Id.*).
Moreover, the court noted that the student's circumstances were

distinguishable from the student in *Kruelle v. New Castle Cnty. Sch. Dist.,* 642 F.2d 687 (3d Cir. 1981), because she "possesse[d] [] basic self-help and social skills" and "sufficient abilities to proceed in her studies in the less restrictive environment of a private day school[.]" (*Id.* at 54). The court noted that, in contrast, a residential placement may be required in circumstances similar to the student in *Kruelle,* 642 F.2d 687 (3d Cir. 1981):

> In *Kruelle,* a mentally retarded child who was unable to speak and not toilet trained was found to need extensive around the clock care as part of his FAPE. "[T]he concept of education is necessarily broad with respect to persons such as Paul. 'Where basic self-help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point.'" *Id.* at 693 (*quoting Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269, 275 (3d Cir. 1980)). *See also Abrahamson,* 701 F.2d at 228 (holding that only residential treatment could provide a FAPE where the student could not eat, dress, go to the bathroom, or care for himself in any way).

M.C.'s parents have argued that her "residential need clearly comes from the same source as the disability code[.]" (ECF No. 12-1, at 42). It may be that M.C.'s disability code of OHI[13] is intertwined with her educational problems, but

---

[13] M.C.'s primary disability is listed in her IEP as Other Health Impairment ("OHI"), and is believed to impact her by causing attention deficit hyperactivity disorder ("ADHD"),

Plaintiffs still have not met their burden to show that a
residential placement is essential for M.C. to make any
educational progress.   The ALJ performed a thorough review of
the testimony presented by each witness on M.C.'s educational
and therapeutic needs, and specifically, on whether she needed
to be in a residential placement to progress in her education.
(ALJ Decision, at 39-56).   He discredited some of the witnesses'
testimony on this issue because he believed they were improperly
influenced by M.C.'s parents regarding the availability of
appropriate educational and therapeutic services in her area.
The ALJ believed this led the Rogers' specialists to suggest a
therapeutic *boarding* school, a recommendation that may have been
made merely for the therapeutic aspects rather than because M.C.
needed the residential component.   (*Id.* at 51).   In addition, he
found that Ms. Satalino and Ms. Kimberly, M.C.'s social worker
and teacher at Glenholme, had not adequately demonstrated their
expertise in special education placements.   He also believed Ms.
Shacoski and Dr. Reese had both written very strong reports on
M.C., neither of which suggested M.C. needed a residential
placement.   (*Id.* at 51-52).   Moreover, Plaintiffs' and
Defendants' witnesses testified that M.C. did not have
habitation needs, *i.e.*, she was fully capable of brushing her

---

anxiety, Tourette Syndrome, mood dysregulation, and obsessive
compulsive disorder ("OCD").

hair and teeth, dressing herself, and using the toilet on her own.  (T. 175-76, 333-34, 671-72, 948-49); *see Abrahamson,* 701 F.2d 223 (finding that a residential program was essential for a severely handicapped student whose developmental delays required that he be given "continual instruction and reinforcement" in general life skills such as how to "talk, respond to words of warning, and dress and feed oneself").  M.C.'s social worker at Glenholme, Ms. Satalino, testified that the benefits to be derived from the residential program were social education, behavioral education, and life skills.  (T. 174).  Although these benefits may be desirable, they are not all essential for M.C. to make progress in her education nor is a residential program the only place where M.C. can gain these skills.[14]  *See Burke Cnty. Bd. of Educ. v. Denton,* 895 F.2d 973, 980 (4th Cir. 1990) (noting that "the Act . . . requires only that the child be able to benefit from the instruction that she receives, not that she be able to maximize her potential") (internal quotation and citation marks omitted).  Unlike the student in *Abrahamson,* M.C.'s parents did not provide evidence that she would regress

---

[14]  Indeed, based on the evidence, RICA appears capable of providing M.C. most if not all of the benefits described by Ms. Satalino as desirable qualities of Glenholme's residential program.  For example, Ms. Schultz testified that RICA would complete a functional behavioral assessment ("FBA") and behavior intervention plan ("BIP") for M.C., and that RICA has many resources and tools to help students like M.C. who have behavioral issues.

by living at home such that she could not progress in her
education.   Accordingly, the ALJ correctly found that a
residential placement was not necessary for M.C. in order to
make progress on her IEP.[15]

### b.   M.C.'s Placement at RICA was Reasonably Calculated to Provide Her a FAPE

Finally, Plaintiffs argue that by giving blind deference to
MCPS's witnesses, the ALJ ignored relevant evidence in the
record and improperly found that RICA is an appropriate IEP
placement for M.C.   Specifically, Plaintiffs assert that RICA is
not an appropriate placement for M.C., who struggles with
transitions, "due to the number of transitions that would be
expected [of her] *each school day* and the lack of self-contained
classrooms."   (ECF No. 12-1, at 36) (emphasis in original).
Although they acknowledge that RICA provides temporary escorts
to assist students with transitions, M.C.'s parents assert that
this "escort accommodation is rarely utilized during a student's
entire time at RICA."   (*Id.*).   In addition, Plaintiffs argue
that the ALJ's conclusion that RICA could meet M.C.'s
educational and therapeutic needs is based on his mistaken

---

[15] Even if M.C.'s parents had presented sufficient evidence
that she required a residential placement, RICA could still
provide her a FAPE, as it offers residential services to
students who require them.   Because M.C. was never interviewed
by the RICA clinical team, however, they were unable to make a
recommendation as to whether they thought the residential
services were necessary to implement her IEP.

assumption that M.C. would be placed in a self-contained classroom at RICA, when in reality all RICA high school students are required to transition from class to class during the day. Plaintiffs contend that the ALJ disregarded the testimony and reports from the parents' witnesses, and gave no reason why he placed his reliance in Ms. Shacoski, MCPS's school psychologist, and Ms. Schultze, the Principal at RICA, who did not have comparable familiarity with M.C. and her condition as did the parents' witnesses.   Plaintiffs conclude that because MCPS has failed to provide M.C. a FAPE, they are entitled to reimbursement for the expenses they incurred for M.C.'s attendance at Glenholme, which they argue is an appropriate private placement for M.C.   (*Id.* at 46).

Defendants respond that Plaintiffs are mistaken about the standard of review as "they argue that their witnesses were more credible than those called by the School Board instead of focusing on the *process* by which the ALJ reached his fact-finding." (ECF No. 15-1, at 39).   Defendants support the ALJ's reliance on Ms. Schultze's testimony on whether RICA could provide M.C. a FAPE, by stating that it "focused on an extensive description of the RICA program (Tr. 819-867) and an explanation as to how that program was fully capable of implementing the recommendations of the Glenholme IEP (*Id.* [at] 868-70), of Dr. Reese's report (*Id.* [at] 892-93) and, most importantly, of the

47

May 7, 2013 IEP [(*Id.* at 896-907)]."   (ECF No. 15-1, at 38 n.13).

The ALJ did not ignore the testimony of Plaintiffs' witnesses regarding transitioning at RICA; rather, he specifically addressed the parents' transitioning argument in his opinion, stating that "[t]he problem of transitions is no more formidable at RICA or Frost than at Glenholme."   (ALJ Decision, at 52).   Moreover, his determination that RICA is an appropriate placement for M.C. despite the fact that it would require her to transition is supported by the record.   For example, M.C. has made educational progress at Glenholme, despite the fact that she must transition from the residential area to her classroom and from her classroom to art, music, and gym class.   At RICA she would be required to make some additional transitions during the day, including from class to class.   RICA, however, has numerous aids to make transitions easier for students, including: providing escorts to students who struggle with transitions and self-control; having teachers and staff stand in the halls to assist students; and providing maps and a buddy system.   Furthermore, Ms. Schultze, who is extremely well-qualified in the area of special education,[16]

---

[16]   Ms. Schultze has been working in the special education field since 1977.   She has an undergraduate degree in special education and a master's degree in educational administration and supervision.   (BDX-56).

testified that it is important for students to learn how successfully to transition because it is a skill they will require throughout their lives and because it enhances their self-esteem.  M.C.'s parents take issue with the fact that a transition escort is rarely provided during the students' entire time at RICA.  As Ms. Schultze testified, however, this is because most students who initially need a transition escort progress to a point where they no longer need an escort.  (T. at 855-857).  M.C.'s parents also believe the ALJ's finding about RICA is mistaken because he based it on the incorrect presumption that M.C. would be in a self-contained classroom at RICA.  (ALJ Decision, at 53).  The ALJ may have incorrectly assumed RICA has self-contained classrooms, however, this does not undermine his ultimate finding that RICA was an appropriate placement.  His decision was not premised on the fact that M.C. needed a self-contained classroom, nor does M.C.'s IEP state such a need.[17]  Instead, the ALJ focused on the plethora of

---

[17] Among other findings, M.C.'s IEP team and CIEP team found that: (1) "[M.C.] requires a small structured setting with small classes and onsite mental health supports" (BDX-30-31); (2) "[M.C.] requires to be in the classroom away from any distractor (peers, noises, etc.) and to reduce distractions to others due to her tics" (BDX-30-36); (3) M.C. will receive social/behavioral and physical/environmental supports throughout the school day (BDX-30-36).  Nothing in the IEP report suggests that M.C. requires a self-contained classroom, only a small class setting, and Ms. Schultze testified that RICA classes generally have 6-7 students and a teacher-student ratio of one to four.  (T. at 858-59).

services available at RICA that fit M.C.'s educational and therapeutic needs, and the fact that RICA has served many students with disabilities similar to M.C.'s. (ALJ Decision, at 53-54). Although M.C. will be required to make several more transitions a day at RICA than Glenholme, ample services are available to help her with this process and there is no evidence that requiring her to transition will deprive her of a FAPE. Accordingly, M.C.'s placement at RICA is reasonably calculated to provide her educational benefits and therapeutic services, and to implement her IEP.

## IV.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Plaintiffs will be denied, and Defendants' cross motion for summary judgment will be granted.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge